UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

CHRISTOPHER LOVIN,            )
                                           )
             *Petitioner*,          )
                                           )
v.                                   )       No.:    3:11-cv-283-TAV-CCS
                                           )
DAVID OSBORNE, Warden,       )
                                           )
             *Respondent*.        )

## MEMORANDUM

This is a petition for the writ of habeas corpus, pursuant to 28 U.S.C. § 2254, filed by petitioner Christopher Lovin ("petitioner"). The matter is before the Court on the answer to the petition filed by the Tennessee Attorney General on behalf of the respondent and petitioner's response thereto. For the following reasons, the petition for the writ of habeas corpus will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE**.

## I.      Standard of Review

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Cases In The United States District Courts, the court is to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. If no hearing is required, the district judge is to dispose of the case as justice dictates. If the record shows

conclusively that petitioner is not entitled to relief under § 2254, there is no need for an

evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d

85, 92 (6th Cir. 1986).

## II.    Factual and Procedural Background

Respondent has provided the Court with copies of the relevant documents as to

petitioner's direct appeal and post-conviction proceedings. [Doc. 12, Notice of Filing of

Documents, Addenda 1-6]. Petitioner was convicted by a jury in the Circuit Court for

Claiborne County, Tennessee, of felony murder in the perpetration of aggravated child

abuse and sentenced to life in prison. The conviction and sentence were affirmed by the

Tennessee Court of Criminal Appeals on direct appeal. *State v. Lovin*, No. E2002-01231-

CCA-R3-CD, 2003 WL 22462532 (Tenn. Crim. App. Oct. 31, 2003) [Addendum 2, Doc.

3].

On direct appeal, petitioner challenged, *inter alia*, the sufficiency of the evidence

to convict him of felony murder. In a lengthy summary, the Tennessee Court of Criminal

Appeals stated the evidence against petitioner as follows:

> At 1:12 A.M. on October 16, 2000, Cindy Gerralls and Rita Hurst,
> emergency medical technicians with the Claiborne County Ambulance
> Service, were dispatched to a Tazewell residence occupied by the
> defendant, Christopher Lovin, and his fiancé, Bonnie Raske. Ms. Raske, the
> mother of the victim, four-month-old Caylis Lovin, was outside directing
> the emergency unit to the proper location. Within four minutes of the
> dispatch, Ms. Gerralls and Ms. Hurst arrived, finding the defendant, the
> father of the victim, inside the residence kneeling over his son. The
> defendant had his left arm under a pillow and his right hand on the victim's
> abdomen. As Ms. Gerralls entered the room, the defendant remarked, "I
> can't do anything more, I've been doing this for 30 or 45 minutes."
> Because the victim was born three months prematurely and had been cared

for in the neonatal intensive care unit at the University of Tennessee Medical Center, he was connected to an apnea monitor at the time the emergency personnel arrived. Ms. Gerralls determined that the victim had no pulse, was "very, very cold and blue and was not breathing." There was no sound of alarm from the monitor during the period the emergency technicians were at the residence. Ms. Gerralls and Ms. Hurst transported the victim by ambulance to the Claiborne County Hospital emergency room, arriving precisely 15 minutes after the original dispatch. The medical staff was able to generate a heart rate but was unable to establish spontaneous respiration. After approximately one hour at the emergency room, the victim was transported to East Tennessee Children's Hospital in Knoxville.

Dr. Joseph Child, a pediatric intensivist, and one of his associates, Dr. Jeff Queen, treated the victim upon his arrival at Children's Hospital. Dr. Child determined that the victim had an extreme buildup of acid in the bloodstream which was the result of either a prolonged period of oxygen deprivation or very low blood pressure. With the assistance of other specialists, Dr. Child was able to determine that there was blood around the surface of the brain and between the hemispheres. The brain was swollen and a CAT Scan indicated that there was no blood flow. Dr. Child described the victim as "cold" and "gray." The victim's kidneys were failing and the retinas of each eye were covered with blood. Treatment was unsuccessful and death resulted from oxygen deprivation.

Bobby Morelock, a detective with the Claiborne County Sheriff's Department, questioned the defendant while the victim was still alive. The defendant made the following statement:

> He was pale all day and coughing and turning colors. Mom got him out of his swing once to check on him. Everything was pretty normal seemed like. He was still pale, gurgling a little but he was breathing. I told Bonnie he was sick, he was just kind of lifeless throughout yesterday and last night. Caylis was asleep when Bonnie went to bed around 12:00. Bonnie fed Caylis before she went to bed. Caylis was crying around 12:30 A.M. and Bonnie asked what he was crying for. I was trying to hook up the heart monitor on him. I fed him before I tried to hook up the heart monitor but I never got the monitor hooked up. I got his breathing treatments ready but Bonnie already had everything ready in the treatment. Caylis was on the couch and asleep so I got the

3

breathing tube and put it close to Caylis's nose so I wouldn't wake him back up. When I got the treatment started and put the hose up to his nose, I held it there until it was done, about five minutes. I then put up ... the breathing treatment. I then went to get his stuff to change his diaper and wipe him off. When I got his clothes off, I noticed he wasn't breathing. One of the reasons I took his clothes off was to hook his monitor back up. I didn't see any response to him. I picked him [up] and didn't feel nothing. I had my left hand on the back of his head, holding it up and just kind of shook it, saying, Caylis, Caylis, hoping he would shake out of it. I leaned down and gave him a puff of air and looked over at the monitor and it was showing nothing. I laid him back down on the couch and began CPR. I was trying for around five minutes. I was just trying to get him back. I kept screaming for Bonnie for a while. [I] never moved him from the couch. I kept giving him puffs and pushing on his chest sometimes. I had to push a little harder because he never would do nothing. Bonnie got up and panicked and I was cussing at Bonnie because she just kept running through the house there and I said go-go call an ambulance, he's not breathing. She left to call and I just kept trying to get him breathing. Every time I quit, the monitor would quit. The ambulance people got there and didn't bring nothing inside with them. They just picked him up and carried him to the ambulance when they came in. I just unhooked the plugs from the monitor.

On the day following his initial statement, the defendant was questioned by TBI Agent Steve Vinsant and Detective Morelock. By the time of this interview, the victim had died. Each of the officers recalled that the defendant had acknowledged that he was alone with the victim at the time the victim stopped breathing. They also remembered that the defendant never made mention of either shaking, striking, or dropping the victim. The defendant was arrested for murder on October 19, three days after the initial hospitalization.

Agent Vinsant recalled that during questioning, the defendant suggested that the emergency personnel may have injured the victim by jumping off the porch without properly supporting the head. Agent Vinsant recalled that the defendant had speculated that the rib fractures may have been due to his efforts at CPR. According to the officer, the defendant had

4

stated that Ms. Raske had been in bed for over an hour before he called for medical assistance.

Dr. Child described infants generally as having large, heavy heads as compared to the rest of the body and having weak neck muscles, thereby making them particularly susceptible to a brain injury due to shaking. It was his opinion that the death of the victim, which occurred within hours after he was transported to Children's Hospital, was due to Shaken Infant Syndrome, which involves a tearing of the blood vessels that support the brain. Dr. Child described the force required to cause the injuries to the victim as "severe" and "violent" in which "the head is just cracking like a whip at the neck." He also found internal bleeding into the abdomen as a contributing cause of death. The spleen was fractured, the liver was torn in three places, and the left kidney and adrenal gland were bruised and damaged, injuries which, in Dr. Child's opinion, "would have eventually led to this baby's death...." It was his assessment that the injuries to the internal organs were the result of "blunt force," which had been "directly applied," a force different from that causing the damage to the head.

Dr. Sandra Elkins, the Director of Autopsy Services and Forensic Pathology at the University of Tennessee Medical Center, and who also serves as Medical Examiner for Knox County, performed the autopsy. She also identified two separate areas of critical injury, either of which would cause death: head trauma qualifying as Shaken Infant Syndrome and blunt force injuries to the chest and abdomen. Dr. Elkins' findings included subdural hematoma or blood clotting on the surface of the brain, retinal hemorrhaging, rib fractures due to a compressing force, pulmonary contusions to the lungs, and severe internal bleeding due to lacerations of the liver and the spleen.

Dr. Elkins described these injuries as very uncommon in infants and, in her opinion, far too severe to result from a fall to the floor or any attempt at cardiopulmonary resuscitation. Dr. Murray Kevin Marks, a forensic anthropologist, assisted in the autopsy. He described a variety of rib fractures ranging from "creases" to "complete breaks." It was his opinion that the fractures were due to significant external pressure on the right front of the chest.

Ronald Ford, a pediatrician at Children's Hospital, described the victim as comatose but still alive upon his admission to the intensive care unit. Due to the signs of brain trauma and the resulting brain swelling, it was Dr. Ford's opinion that the victim had died of "very violent shaking."

5

It was Dr. Ford's further assessment that because of the extensive nature of the injury, the victim's brain was no longer able to send signals to the other organs to maintain their function.

Bonnie Raske, the 18-year-old mother of the victim, testified as a defense witness. She stated that the premature birth of the victim had caused breathing difficulties to such an extent that he required an apnea monitor. Ms. Raske confirmed that while the victim was born on June 11, he was not released from the hospital until September 2 and had been in her home for less than a month and a half at the time of his death. She described the victim as "always coughing, throwing up, he wouldn't hold his formula down." According to Ms. Raske, the victim was re-hospitalized, treated for pneumonia, and released about one week prior to his death. Seven months pregnant with a second child by the time of trial, Ms. Raske described the defendant as a loving father. She claimed that only hours prior to the episode that led to his death, the victim had stopped breathing and that she had revived him by shaking him and breathing into his mouth. Ms. Raske stated that the victim "constantly quit breathing" as indicated by his apnea monitor alarm. On the evening of the victim's last hospitalization, Ms. Raske and the defendant had bought wine and had drinks. According to Ms. Raske, she became intoxicated, went to bed, and asked the defendant to take care of the victim. She recalled being awakened when the defendant began to scream that the victim was not breathing. At the defendant's direction, Ms. Raske called 911 while the defendant administered CPR, using "both hands."

The defendant, testifying at trial in his own behalf, contended that he had planned a romantic evening with his fiancé and that after dinner, their lovemaking was interrupted when Ms. Raske became ill from too much wine. The defendant claimed that he later gave the victim his medication and prepared him for bed. The defendant stated that the apnea monitor alarm sounded as the victim stopped breathing. While acknowledging that he had shaken the victim's leg, the defendant claimed that he had done so gently in an effort to revive the victim and then breathed air into his mouth. The defendant testified that he began CPR by using an index finger on the chest and that when there was no response, he screamed for help from Ms. Raske, who was too dazed to assist. The defendant stated that he then made contact with the victim's upper stomach in an effort to perform CPR and increased pressure to the area just above the navel. He described the pressure he applied with his hands as "more than I was realizing at the time." The defendant stated that he believed the victim was either dying or dead by the time the ambulance arrived. He described himself as in shock

and acknowledged that he had squeezed the victim "so hard ... my arms were shaking" as he attempted resuscitation. The defendant also admitted shaking the victim but was unable to say how hard. It was his contention that the medication had caused the victim to stop breathing.

*Id.* at **1-3. The appellate court concluded the evidence was sufficient to support the conviction for felony murder, *id.* at *5, and that the other allegations of error lacked merit, *id.* at *6.

Petitioner then filed a *pro* se petition for post-conviction relief, in which he asserted various claims of ineffective assistance of counsel. Counsel was appointed to represent petitioner, and he filed an amended post-conviction petition. Petitioner then retained private counsel who filed a second amended petition. The post-conviction petition, as amended, was denied after an evidentiary hearing, and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Lovin v. State*, No. E2006-01883-CCA-R3-PC, 2007 WL 1946667 (Tenn. Crim. App. July 5, 2007) [Addendum 4, Doc. 3], *permission to appeal granted, id.*, (Tenn. December Jan. 14, 2008) [Addendum 4, Doc. 6].

The Tennessee Supreme Court granted the application for permission to appeal and vacated the judgment of the Court of Criminal Appeals, finding that the appellate court erred in denying petitioner's motion to dismiss retained counsel and to represent himself on appeal. *Lovin v. State*, 286 S.W.3d 275, 279 (Tenn. 2009) [Addendum 5, Doc. 6]. The court remanded the case with instructions to remand the case to the trial court for a hearing to determine whether the petitioner knowingly and voluntarily waived his right to post-conviction counsel. *Id.* at 280. The court further instructed:

If the trial court determines that Mr. Lovin has not knowingly waived his right to counsel or effectively exercised his right of self-representation, the court shall then, following the procedures required by the applicable statutes and rules, provide Mr. Lovin with a reasonable opportunity to retain a new lawyer or appoint a lawyer to represent Mr. Lovin on appeal in accordance with Tenn. Sup.Ct. R. 13.

If the trial court has determined that Mr. Lovin has appropriately waived his right to counsel and has chosen to represent himself, the Court of Criminal Appeals shall then set a new briefing schedule in accordance with Tenn. R. App. P. 29 and shall direct Mr. Lovin to file his brief. Following the filing of all the briefs, the Court of Criminal Appeals shall proceed to decide the appeal.

*Id*. at 289-90.

On remand, "the trial court determined that the Petitioner did not knowingly and voluntarily waive his right to counsel and appointed counsel." *Lovin v. State*, No. E2009-00939-CCA-RM-PC, 2010 WL 4540066 at *5 (Tenn. Crim. App. Nov. 10, 2010) [Addendum 6, Doc. 3], *perm. app. denied, id*. (Tenn. April 14, 2011) [Addendum 6, Doc. 6]. Petitioner's appellate brief, through appointed counsel, was then filed with the Tennessee Court of Criminal Appeals, *id*., and the denial of post-conviction was again affirmed. *Id*. at *13.

In support of his petition for the writ of habeas corpus, petitioner alleges that the evidence was insufficient to support the conviction and that the trial court erred in failing to exclude cumulative and repetitive expert testimony; petitioner also alleges several instances of ineffective assistance of counsel. Respondent contends he is entitled to judgment as a matter of law based on either procedural default, the findings of the Tennessee state courts, or because the claim is not cognizable in federal habeas corpus.

### III.    Procedural Default

The doctrine of procedural default is an extension of the exhaustion doctrine.  A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies.  28 U.S.C. § 2254.  This rule has been interpreted by the Supreme Court as one of total exhaustion.  *Rose v. Lundy*, 455 U.S. 509 (1982).  Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court.  *Picard v. Connor*, 404 U.S. 270 (1971).  *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review.").  Moreover, the substance of the claim must have been presented as a federal constitutional claim.  *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Petitioner cannot file another state petition for post-conviction relief.  Tenn. Code Ann. § 40-30-102(c).  Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation."  *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977).  *Accord Engle v.*

*Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991)

Petitioner argues two theories for why the evidence was not sufficient to support his conviction, one of which is that, to secure a conviction for felony murder in the perpetration of aggravated child abuse under Tennessee law, the State must prove a serious bodily injury that resulted in death. He alleges that in his case the State only proved a death and treated the death as the serious bodily injury; according to petitioner, immediate death does not meet the essential element test for a serious bodily injury. Petitioner did not raise this issue in the state courts and the issue has been procedurally defaulted. Accordingly, the Court will not consider this claim for relief.

## IV.    Non-Cognizable Claim

Petitioner claims the trial court erred in failing to exclude cumulative and repetitive expert testimony from three doctors as to the child' injuries and cause of death. This claim was considered and rejected on direct appeal:

10

Next, the defendant argues that the trial court committed reversible error by failing to exclude cumulative expert testimony relating to the cause of death. The defendant submits that it was prejudicial for the trial court to permit three medical experts to testify to the nature of the injuries suffered by the victim and the possible causes of death. It is the defendant's contention that the testimony of two of the three physicians should have been excluded.

…

In the circumstances of this case, it is our view that the use of three physicians to testify to the extent of the victim's injuries and the cause of his death did not unfairly prejudice the defendant. Cause of death was the central issue. Certainly the trial court did not abuse its discretionary authority. Initially, two of the three medical experts utilized by the state had treated the victim. Dr. Child and Dr. Ford were at Children's Hospital and, in conjunction with other physicians who were not called as witnesses, made specific medical findings in an effort to save the life of the victim. Because the victim, due to a premature birth, required a sleep apnea monitor and because the defendant claimed that some of the injuries were the result of his attempts at resuscitation, a second opinion had significant probative value. Moreover, because the convicting evidence was entirely circumstantial, the state had the burden of excluding every reasonable hypothesis other than the defendant's guilt of the crime charged. The testimony of the pathologist was equally essential as to the cause of the victims death. Confirmation of a substantial hematoma, retinal hemorrhaging, rib fractures, and lacerations to the internal organs tended to refute beyond any reasonable doubt the defendant's claims of innocence.

*State v. Lovin*, 2003 WL 22462532 at **5-6.

Respondent contends that petitioner's challenge to the trial court's evidentiary ruling is not cognizable in federal habeas corpus proceedings. "Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *accord, Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause

does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"). The Court agrees with the conclusion of the Tennessee Court of Criminal Appeals that petitioner has failed to demonstrate that his right to a fair trial was abridged. The Court therefore lacks jurisdiction to consider this claim.

## V.     State Court Findings

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct, and petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established

12

federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

Recent case law demonstrates a high bar that a habeas petitioner must meet under the standard set by the AEDPA. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[A] habeas court must determine what arguments or theories supported or ... could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id*. As the Supreme Court has acknowledged: "If this standard is difficult to meet, that is because it is meant to be." *Id*. *See also Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010) ("AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."); *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012) ("[T]he Supreme Court has very recently made abundantly clear that the review granted by the AEDPA is even more constricted that AEDPA's plain language already suggests.") (citing *Harrington v. Richter*, 131 S. Ct. at 786).

Petitioner has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this Court. In light of the foregoing, the Court will consider petitioner's remaining claims for relief.

## VI. Discussion of Claims on the Merits

### A. Sufficiency of the Evidence

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). However, the petitioner is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988).

14

A conviction should be affirmed if any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987).

Petitioner claims the evidence failed to prove that he knowingly, not accidentally, treated his child in a manner which resulted in injury and death. Petitioner raised this claim on direct appeal:

> In this appeal, the defendant first argues that the state failed to prove that he had any awareness of being abusive when the fatal injuries were inflicted. It is his claim that the injuries occurred as the defendant increased his level of force in the administration of CPR. He argues that the injuries to the brain were the result of his attempts to remove the medication be [sic] believed had initially caused the victim to stop breathing. The defendant submits that it is "entirely logical and reasonable" that the injuries were accidental.

*State v. Lovin*, 2003 WL 22462532 at *4.

In considering petitioner's claim that the evidence was not sufficient to support his conviction, the Tennessee Court of Criminal Appeals first observed:

> On appeal and after a guilty verdict, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.

15

*Id.* (citations omitted).

The appellate court then rejected the claim:

All of the medical evidence established that the victim died from head injuries resulting from a violent shaking and from internal bleeding due to blunt force trauma to the torso. The defendant acknowledged that only he was in a position to inflict injuries of that nature unless, of course, his speculation about the medical technicians' possible mishandling of the victim had been supported by the evidence offered at trial. While the defense presented a plausible theory that the defendant had panicked in an emergency situation and unintentionally caused the death of a particularly vulnerable infant, it was the prerogative of the jury to determine whether the proof offered by the state excluded every reasonable hypothesis except for guilt as charged.

That the jury rejected the defendant's claim that he had only gently shaken the leg of the victim is not surprising. He had made no mention of having shaken the victim in his statement to the police and each of three physicians determined that the severity of the injuries belied his explanation.

In its review of the evidence, an appellate court must afford the state the "strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." The court may not "reweigh or reevaluate the evidence" in the record below. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or the trial court judgment. By the use of these guidelines, the evidence is sufficient to support the conviction.

*Id.* at 5 (quoting, respectively, *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)).

This Court has reviewed the transcript of evidence at petitioner's trial [Addendum 1, Vol. 2-4, Transcript of Evidence, pp. 1-407] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record. There is no question that the victim died as the result of brain injury from a violent shaking as well as blunt trauma

16

and internal bleeding. Based upon the foregoing, the appellate court's decision was neither contrary to, nor did it involve an unreasonable application of, federal law. Accordingly, petitioner is not entitled to relief on his claim that the evidence was insufficient to support his conviction for felony murder.

### B. Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), petitioner must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel*

*v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction absent prejudice to the defendant so as to render the conviction unreliable. *Id.* at 691-92.

Petitioner alleges four instances of ineffective assistance of counsel: (1) counsel failed to object to the State's motion to amend the indictment to delete the word recklessly; (2) counsel failed to call Rita Hurst as a witness or to utilize her report; (3) counsel failed to properly object to the demonstration involving a tissue box; and (4) counsel failed to require the State to elect a singly theory of death. These claims were considered and rejected by the Tennessee Court of Criminal Appeals in post-conviction proceedings.

The Court notes that in doing so, the Tennessee Court of Criminal Appeals observed that *Strickland v. Washington*'s two-prong test is the standard for considering ineffective assistance claims. *Lovin v. State*, 2010 WL 4540066 at *7. In considering petitioner's claims of ineffective assistance of counsel, the appellate court first summarized the testimony adduced during the post-conviction evidentiary hearing.

> At the post-conviction hearing, the Petitioner testified that trial counsel was deficient for allowing the State to present two theories of death, one involving Shaken Infant Syndrome and the other involving internal organ injuries. The Petitioner said that trial counsel should have requested that the State elect which injury was the cause of death. He said that forcing the State to elect a single theory of the cause of death would ensure an unanimous jury verdict based on a single theory.

> The Petitioner testified that although trial counsel argued that the Petitioner injured the victim during CPR, trial counsel should have also argued that the injuries were caused by the Petitioner's attempts to remove improperly administered medication. The Petitioner said he turned the

18

victim upside down, squeezed his stomach, and shook the victim in an effort to dislodge the medication. He agreed that he explained these resuscitation efforts during the trial, but he said trial counsel failed to ask the State's medical experts if the Petitioner's attempts to remove the medication could have caused the victim's injuries.

The Petitioner testified that trial counsel failed to hire medical experts to rebut the testimony of the State's experts. He was unaware that trial counsel sent the victim's autopsy report and other medical records to Dr. Randall Pedigo for review. He was also unaware that Dr. Pedigo concluded that no reasonable medical expert would refute the conclusions of the State's experts. The Petitioner said that he did not have medical experts at the post-conviction hearing who would refute the medical testimony from the trial but that he asked his post-conviction counsel several times to learn the cost of hiring a medical expert and that counsel failed to do so. He also said his post-conviction attorney failed to comply with his request to subpoena the doctors who testified at the trial.

The Petitioner testified that he spoke with Emergency Medical Technicians (EMT) Rita Hurst and Cindy Gerralls on the night the victim was injured. Ms. Gerralls testified at trial, while Ms. Hurst did not. The Petitioner said that trial counsel should have called Ms. Hurst to testify at trial because her testimony would have supported his statement that he improperly administered the victim's medication. He said that Ms. Hurst's report stated she was unable to insert a breathing tube into the victim because of excess secretions in his airway. He said he told Ms. Gerralls that he gave the victim's medication improperly. He noted that his statement to Ms. Gerralls was contained in her written report. He agreed that the medical experts at trial did not state that medicine or congestion killed the victim.

Trial counsel testified that he began working as a public defender in 1990 and that he dealt exclusively with criminal defense law. He said he had represented many defendants charged with murder. He said he discussed trial strategy with the Petitioner and that they agreed that it was best to go with a single theory of defense based on the Petitioner's claim that the victim's injuries were accidental.

Trial counsel testified that the Petitioner told him of his attempts to perform CPR and his attempts to remove medication that he improperly administered. He said he asked the State's medical experts if the victim's injuries could have occurred accidentally or through the improper use of

CPR. He could not recall if he asked them if the injuries could have occurred during the Petitioner's attempts to remove medication.

Trial counsel testified that he consulted Dr. Pedigo to determine if he could present a defense based on medical testimony. He said that Dr. Pedigo concluded that the injuries were most consistent with a violent assault and did not appear to be consistent with accidental injuries caused during CPR. He said Dr. Pedigo's findings were consistent with the findings of the State's medical experts, including those of Dr. Sandra Elkins. Trial counsel said he met with Dr. Elkins to discuss the medical evidence. During that discussion, he asked Dr. Elkins many questions, some of which were prepared by Dr. Pedigo.

Trial counsel testified that he had access to the EMT reports made by Ms. Gerralls and Ms. Hurst. He said Ms. Hurst's report stated that the victim's airway was congested with secretions. While he admitted that Ms. Hurst's statement was consistent with the Petitioner's testimony that the victim was congested, he did not think that her statement would be helpful to the Petitioner's case. He said he was unaware of any beneficial information that Ms. Hurst could have added to the testimony given by Ms. Gerralls at trial.

*Id*. at **5-6.

The Court has reviewed the transcript of evidence at petitioner's post-conviction hearing. [Addendum 3, Vol. 2, Transcript of Post-Conviction Evidentiary Hearing, pp. 1-82]. The summary of testimony is supported in the record.

As noted, petitioner alleges four instances of ineffective assistance of counsel. The Court will consider each in turn.

### 1.       Failure to object to the amendment of the indictment.

The Tennessee Court of Criminal Appeals summarized the issue as follows:

The Petitioner contends that trial counsel rendered ineffective assistance by failing to object to the State's amendment of the Petitioner's indictment. The State contends that trial counsel's performance was not deficient because the amendment removed surplus language but did not

change the offense charged or the underlying facts. We hold that the trial court properly found that trial counsel was not ineffective by not objecting to the amendment.

The indictment charged that the Petitioner "on or about October 15–16, 2000, ... did unlawfully, feloniously, and recklessly kill CAYLIS LOVIN during the perpetration of aggravated child abuse, in violation of T.C.A. 39–13–202." Before trial, the State filed a motion to amend the indictment by deleting the word "recklessly." Trial counsel did not object to the amendment.

*Lovin v. State*, 2010 WL 4540066 at *8.

In analyzing the issue, the appellate court first set forth the relevant Tennessee statutes:

At the time of the offense, the first degree murder statute provided:

**39–13–202 First degree murder.**

(a) First degree murder is:

...

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy; ...

(b) No culpable mental state is required for conviction under subdivision (a)(2) ... except the intent to commit the enumerated offenses or acts in such [subdivision].

T.C.A. § 39–13–202(a)(2), (b) (Supp. 2000) (amended 2002, 2007). The aggravated child abuse statute provided:

**39–15–402 Aggravated child abuse and neglect.**

(a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39–15–401 and:

21

(1) The act of abuse or neglect results in serious bodily injury to the child; ...

*Id.*, § 39–15–402(a)(1) (Supp. 2000) (amended 2005, 2009). The offense of child abuse was defined as:

**39–15–401 Child abuse and neglect.**

(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits [child abuse or neglect].

*Id.*, § 39–15–401(a) (Supp. 2000) (amended 2005, 2006, 2008, 2009).

*Id.* at **8-9.

The court then observed that "[b]oth the United States and Tennessee constitutions guarantee an accused "the right to be informed of the nature and cause of the accusation." *Id.* at *9 (quoting *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997)). The court also noted that "[a]n indictment will be deemed valid so long as it provides sufficient information to enable the defendant to know the accusation to defend, to furnish the trial court an adequate basis for entry of a proper judgment, and to protect the defendant from double jeopardy." *Id.*

The court concluded that the original indictment was constitutional:

The indictment, as originally drafted, met the notice requirements. It charged that the Petitioner committed first degree felony murder in the perpetration of aggravated child abuse of a named victim on a stated date. The indictment cited the pertinent penal statute. From this, the Petitioner knew the charge against which he must defend, the court had a basis for entry of judgment, and the Petitioner was protected from double jeopardy.

*Id.* (citation omitted).

22

With respect to the amendment of the indictment to delete the work recklessly, the

Tennessee Court of Criminal Appeals found no constitutional violation:

> Following its 1995 amendment, the felony murder statute that was in effect at the time of the crime stated that no culpable mental state, other than that required by the underlying felony statute, was required. The word "recklessly" in the indictment was surplusage. The statute for the offense of aggravated child abuse required that the perpetrator act "knowingly." The amendment of the indictment to remove the word "reckless" did not change the offense. The Petitioner was on notice of the required mental state because the indictment named the underlying felony. Because the amendment was proper under Rule 7(b), there was no basis for trial counsel to object to the amendment. Further, the Petitioner was not prejudiced by the amendment because the same offense was charged.
>
> We have not overlooked the Petitioner's claim in his brief that his due process rights were violated by the State's "surreptitiously sidestepping the indictment procedure and allowing the grand jury to indict the Petitioner for felony-murder based on lesser 'reckless' conduct when the crime for which he was tried and convicted required the more culpable standard of 'knowing' conduct to be considered." The original indictment reflects that the grand jury indicted the Petitioner for recklessly killing the victim while knowingly committing aggravated child abuse. To the extent that the grand jury found evidence of a reckless killing, the indictment reflected a more culpable killing than that which would be legally sufficient to sustain a conviction of felony murder. This theory provided no basis for trial counsel to have lodged a meritorious objection.
>
> The trial court did not err in finding that the Petitioner failed to prove that counsel was ineffective for failing to object to the indictment amendment. The Petitioner is not entitled to relief.

*Id*. at **9-10 (citations omitted).

The decision of the Tennessee Court of Criminal Appeals that the indictment was

sufficient, and that there was no reason to object to the amendment of the indictment, was

neither contrary to, nor did it involve an unreasonable application of, federal law. "In

general an indictment is constitutionally adequate 'if it, first, contains the elements of the

offense charged and fairly informs a defendant of the charges against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Monus*, 128 F.3d 367, 388 (6th Cir. 1998) (quoting *United States v. Superior Growers Supply, Inc*., 982 F.2d 173, 176 (6th Cir.1992)). Accordingly, petitioner is not entitled to relief on this claim.

### 2. Failure to call Rita Hurst as a witness.

Petitioner alleges that counsel should have called Rita Hurst as a witness or otherwise used her report that the victim was congested, thereby bolstering his claim that he improperly gave his son medication and that the injuries resulted from an improper rescue attempt. This was raised in the state courts with respect to evidence by medical experts and is summarized by the state appellate court as follows:

> The Petitioner's complaints are that trial counsel did not cross-examine the State's medical experts about whether the victim's injuries could be explained by the Petitioner's having improperly administered the victim's medication, that counsel did not present proof that EMT Rita Hurst noted upon her arrival at the scene that the victim had "so much secretions" that he could not be intubated, and that counsel did not present defense expert proof to contradict the State's expert proof. The record reflects that counsel consulted Dr. Pedigo, who, after reviewing the autopsy report and speaking with the forensic pathologist who performed the autopsy, offered his opinion that no reasonable medical expert would disagree with the conclusions of the State's experts. Trial counsel had Dr. Pedigo assist him by providing questions for counsel to ask Dr. Elkins.

> Counsel testified that he met with Dr. Elkins and consulted with the Petitioner about her statements. He said that Dr. Elkins believed the victim suffered the worst case of child abuse that she had ever seen and that counsel concluded that he would be unable to find a reasonable forensic expert who disagreed with her.

Although the Petitioner complains that counsel should have consulted more than one medical expert, he failed to present the testimony of another medical expert at the post-conviction hearing. He failed to establish that there was a qualified expert who counsel exercising reasonable diligence could have called to rebut the State's experts.

Given this information, counsel had no basis for cross-examining the experts about improper medication administration. There was also no relevant basis upon which to offer Ms. Hurst's testimony or her report of the excess secretions. Likewise, counsel had been advised that no credible expert would testify that the victim's death was caused by improper medication procedure. The Petitioner did not present any expert proof at the hearing to establish that his theory of improper medication was possible and therefore should have been pursued by counsel.

*Lovin v. State*, 2010 WL 4540066 at *10.

Petitioner's former trial counsel, Charles Herman, testified for the State during the post-conviction hearing. Mr. Herman stated that he used the services of Dr. Randall Pedigo, a former Knox County medical examiner, to review the case. [Addendum 3, Vol. 2, Transcript of Post-Conviction Evidentiary Hearing, p. 64]. Dr. Pedigo concluded that the victim's injuries were "not consistent with injuries during CPR. These injuries are more -- most consistent with a violent assault." [*Id*. at 64-65]. Mr. Herman also noted that "Dr. Elkins said this case was the worse case of child abuse she had ever seen, and I do not believe there is any reasonable forensic expert who would differ with her." [*Id*. at 65].

Given all the medical testimony that the victim's injuries and death were the result of child abuse, Ms. Hurst's testimony would not have been relevant, and petitioner's counsel did not render ineffective assistance in failing to call her as a witness. The decision of the Tennessee Court of Criminal Appeals in this regard was neither contrary

25

to, nor did it involve an unreasonable application of, federal law as established in *Strickland*.

### 3.      Failure to properly object to demonstration.

Petitioner alleges that counsel failed to properly object to the demonstration utilizing a tissue box and failed to preserve the issue for appeal.  The Tennessee Court of Criminal Appeals framed the issue as follows:

> The Petitioner contends that counsel was ineffective by failing to object properly to a demonstration the State had the Petitioner do during cross-examination and that counsel failed to preserve the issue for the motion for new trial and the direct appeal. The demonstration consisted of the Petitioner's actions toward the victim and was performed with a tissue box representing the victim. The State responds that trial counsel's objection was overruled and that the Petitioner has not shown prejudice. We agree with the State.

*Lovin v. State*, 2010 WL 4540066 at *11.

The appellate court first noted that "[w]hether to allow a demonstration is a matter for the discretion of the trial court. Like all evidence, the demonstration must be relevant evidence, and its probative valued must not be substantially outweighed by the danger of unfair prejudice." *Id*. (internal citations omitted).

The court further observed:

> A defendant's right to a fair trial may be infringed if he is forced to perform acts which would unjustly prejudice him. Prejudice may arise in cases where the requested performance or demonstration would unjustly humiliate or degrade the defendant, or where such performance would be damaging to the defendant's image and is irrelevant to an issue at trial.

*Id*. (internal citations omitted).

The court then concluded the proof was not sufficient to demonstrate ineffective assistance as to the matter of the demonstration:

> The record reflects that during the demonstration, trial counsel said, "Your Honor, I don't know if he can do that on a box of Kleenex or not, accurately demonstrate ..." The trial court ruled that the demonstration would be allowed, subject to it appearing to be adequately demonstrated. With respect to the demonstration itself, the record before us does not provide an extensive description of the Petitioner's actions. The trial record reflects that the demonstration took place during portions of cross-examination of the Petitioner covering seven pages of the transcript and that the questions dealt generally with the amount of force the Petitioner used when he attempted to revive the victim by using CPR and by squeezing and shaking him. We note that the Petitioner's theory of defense was that he improperly medicated and then injured the victim when he attempted to revive him. The Petitioner admitted shaking the victim and attempting CPR. The manner in which he physically handled the victim was highly relevant to the central issues in the case. Although the Petitioner argues that the demonstration was unjustly prejudicial, the record does not provide clear and convincing proof that the demonstration was inadmissible proof for which counsel was ineffective for failing to have excluded or for not obtaining appellate relief. The trial court did not err in denying post-conviction relief.

*Id.*

As the Tennessee Court of Criminal Appeals noted, petitioner's defense was that he injured his son while improperly performing CPR, and thus the way he handled the child was clearly relevant. Counsel did object to the demonstration, but the trial court allowed it to continue. Had counsel made a more vigorous objection, it would in all likelihood have been overruled. Under the circumstances, petitioner has failed to demonstrate prejudice and the decision of the Tennessee Court of Criminal Appeals in this regard was neither contrary to, nor did it involve an unreasonable application of, federal law as established in *Strickland*.

27

#### 4. Failure to require the State to elect a single theory of death.

Petitioner alleges counsel should have required the State to elect a single theory of cause of death, namely whether death resulted from the brain injury or the injuries to the victim's internal organs. The Tennessee Court of Criminal Appeals disagreed:

> In his last issue, the Petitioner contends that trial counsel was ineffective because he failed to object to the State's use of two theories of causation for the victim's death and failed to require that the State elect a single theory of death. He contends that the jury verdict against him was improper because it was not unanimous. The State responds that the prosecution was entitled to rely on evidence that the victim suffered multiple injuries, at least two of which were severe enough to be fatal, during the perpetration of aggravated child abuse on the date named in the indictment. We agree with the State that the Petitioner is not entitled to relief because there was no election or juror unanimity problem.

*Lovin v. State*, 2010 WL 4540066 at *12.

The appellate court first set out when an election is necessary and when it is not required:

> The courts of this state have repeatedly held that when evidence is presented of multiple offenses that would fit the allegations of the charge, the trial court must require the State to elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected.

>> This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

28

The requirements of election and a jury unanimity instruction exist even though the defendant has not requested them.

"When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises." Consequently, the trial court may properly submit to the jury multiple counts embodying different theories for committing a single offense.

*Id.* (quoting *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000), internal citations omitted).

The court then determined that an election was not required under the facts of the case:

In the present case, the indictment charged that the Petitioner committed the offense of felony murder in the perpetration of aggravated child abuse "on or about October 15–16, 2000." The State presented evidence that the victim had multiple injuries caused by the Petitioner during one criminal event and that two of the injuries could have been fatal. The Petitioner was charged with only one offense, and the proof showed alternative means of committing the offense, not alternative offenses. No election was required. Trial counsel was not deficient because he did not object to the State's alternative theories and did not request a unanimity instruction. The trial court did not err in denying post-conviction relief on this basis.

*Id.* (citing *State v. Hodges*, 7 S.W.3d 609, 624–25 (Tenn. Crim. App. 1998) (no election required for conviction of felony murder in the perpetration of or attempt to perpetrate aggravated child abuse where State presented two alternative means of culpability for a single offense, not two alternative offenses)).

Petitioner was charged with, and convicted of, felony murder. The State was free to present evidence of various ways in which the murder could have been committed. The State was not required to make an election and thus counsel did not render ineffective assistance by failing to require the State to make an election.

29

Based upon the foregoing, the Court concludes that the state courts' determinations that petitioner received the effective assistance of counsel were neither contrary to, nor did they involve an unreasonable application of, federal law as established by the Supreme Court in *Strickland v. Washington*. Petitioner is not entitled to relief on his claims of ineffective assistance of counsel.

## VII. Conclusion

The petition for habeas corpus relief will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE**. Petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure. The Court will further **DENY** petitioner leave to proceed *in forma pauperis* on appeal.

**AN APPROPRIATE ORDER WILL ENTER.**


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE